* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An Employee-Employer relationship existed between Plaintiff and Defendant-Employer at all relevant times herein.
3. Defendant-Carrier Royal SunAlliance was on the risk from October 1, 2000 to October 1, 2003.
4. The parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
5. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this claim pursuant to the Workers' Compensation Act.
6. The alleged date of onset of the Plaintiff's claimed occupational conditions is October 16, 2002.
7. The following items were stipulated into evidence:
 a. The Pre-Trial Agreement marked as stipulated exhibit 1.
 b. A packet of Industrial Commission forms marked as stipulated exhibit 2.
 c. A compromise settlement agreement dated December 17, 1999, marked as stipulated exhibit 3.
 d. A packet of medical records paginated A1-2 through J1 marked as stipulated exhibit 4.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The issues on appeal before the Full Commission are: (a) whether Plaintiff developed carpal tunnel syndrome and injuries to both hands, arms, shoulders and neck as a result of her employment as an administrative assistant with Defendant-Employer; and (b) whether Plaintiff's claim is barred by a compromise settlement agreement filed February 1, 2000.
2. Plaintiff worked as a meat wrapper in Defendant-Employer's meat department from 1988 through February 1995, and as an administrative assistant from September 1995 through September 2003.
3. On October 29, 2003, Plaintiff initiated the instant claim by filing a Form 18 Notice of Accident to Employer with the Industrial Commission. Plaintiff is claiming that her work with Defendant-Employer as an administrative assistant caused her to again contract carpal tunnel syndrome and sustain injuries to her hands, arms, shoulder and neck.
4. Plaintiff developed symptoms consistent with bilateral carpal tunnel syndrome, right greater than left, in 1993. Plaintiff underwent right carpal tunnel release surgery on October 11, 1993, and left carpal tunnel release surgery on November 17, 1993. Plaintiff returned to work in a limited capacity and eventually redeveloped bilateral symptoms of carpal tunnel syndrome. Plaintiff underwent a repeat left carpal tunnel release on November 28, 1994. Subsequent to this surgery, Plaintiff continued to have symptoms in her right hand. Plaintiff underwent exploratory surgery on her right hand on June 21, 1995, including a release of adhesions and reapplication of the muscle flap. Plaintiff was out of work a short time following the June 1995 release surgery.
5. Plaintiff returned to work with Defendant-Employer in June 1995, as a meat wrapper and again redeveloped bilateral symptoms consistent with carpal tunnel syndrome. Dr. Jon Kolkin of the Raleigh Hand Center examined Plaintiff on December 11, 1997, and found that her condition remained unchanged but increased her permanent partial disability ratings to 10% for each hand.
6. Defendant-Employer was self-insured at the time of the original onset of Plaintiff's bilateral carpal tunnel syndrome and remained self-insured through December 31, 1994, with Key Risk Management Services (Key Risk) acting as the servicing agent/administrator. After December 31, 1994, Defendant-Employer had coverage with Zenith Insurance Company (Zenith) through December 31, 1998.
7. The original claim (I.C. File No. 365282) was accepted as compensable. After Plaintiff suffered recurrent bilateral symptoms of carpal tunnel syndrome in 1995, an issue arose between Key Risk and Zenith as to which entity was responsible for the Plaintiff's ongoing medical treatment and disability benefits.
8. Plaintiff, Zenith, and Defendant-Employer as self-insured with servicing agent Key Risk entered into a compromise settlement agreement for a partial settlement and release on December 17, 1999. The Industrial Commission approved the compromise settlement agreement on February 1, 2000.
9. Paragraph 7 of the compromise settlement agreement reads: "The [Plaintiff] expressly reserves the right to pursue any and all claims related to a further need for medical treatment or inability to work as a result of the original compensable condition or a change of condition against the [E]mployer as an entity under the Workers' Compensation Act after December 31, 1998 and any [C]arrier then on the risk." (Emphasis in the original).
10. On October 16, 2002, Plaintiff was treated by her primary care physician, Dr. Laksham Rao, for complaints of pain in her neck, arms, and hands. Dr. Rao diagnosed Plaintiff with chronic pain secondary to muscle spasms of the neck and shoulder and referred her to Dr. Howard Brown at Brown Orthopaedic Surgery 
Sports Medicine Center.
11. On October 28, 2002, Plaintiff saw Dr. Brown and reported neck pain with radiation of symptoms into her left arm that started three months earlier when she fell out of the back door at her home. Dr. Brown diagnosed Plaintiff with cervical and thoracic strain and recommended conservative treatment including physical therapy. Dr. Brown eventually recommended a bone scan that revealed mild degenerative changes at the L5-S1 level, but was otherwise normal. Dr. Brown also ordered a cervical MRI that was performed on January 11, 2003. This MRI revealed a left-sided disc bulge at the C5-C6 level with minimal left-sided foraminal narrowing, but no evidence of herniation, stenosis, or nerve impingement.
12. Upon recommendation of Dr. Brown, on February 27, 2003, Plaintiff underwent repeat electrodiagnostic studies of both upper extremities. These studies revealed mild median neuropathy consistent with right-sided carpal tunnel syndrome and possible radiculopathy at the C6 level on the left. Dr. Brown referred Plaintiff to Dr. Denise E. Bullard at Triangle Neurosurgery for evaluation of her cervical condition.
13. Dr. Bullard saw Plaintiff on March 13, 2003. Plaintiff's chief complaints were neck pain and bilateral upper extremity pain and numbness. Plaintiff related a five-year history of cervical pain. Dr. Bullard recommended, a cervical myelogram and a post-myelogram CT scan, which were performed on March 21, 2003. These tests revealed mild degenerative changes at the C4-C5 and C5-C6 levels with no evidence of herniations, stenosis, or nerve root compression. Dr. Bullard wrote a letter to Dr. Brown indicating that he did not know the exact nature of Plaintiff's problems.
14. Dr. Brown performed right carpal tunnel revision release surgery on Plaintiff on May 29, 2003. Dr. Brown took Plaintiff out of work from May 29, 2003 through September 3, 2003. He then released her to light-duty work for twenty hours per week and restricted her to lifting no greater than five pounds, no heavy gripping, pushing, or pulling greater than five pounds and no use of vibrating tools. Dr. Brown completed a statement on June 4, 2003, opining that Plaintiff's carpal tunnel syndrome did not arise out of her employment. On Plaintiff's application for long-term disability through Defendant-Employer, Dr. Brown indicated on September 12, 2003, that he did not know the cause of Plaintiff's carpal tunnel syndrome.
15. Plaintiff continued to treat with Dr. Brown on a conservative basis for neck, shoulder, arm and hand pain. On April 20, 2004, Plaintiff's upper extremities had returned to normal limits according to electrodiagnostic studies. Plaintiff was given a functional capacity evaluation (FCE) in August 2004, which indicated she had given inconsistent effort, but was capable of working at the light to medium demand level.
16. On October 13, 2004, Dr. Brown noted for the first time that the conditions for which he had treated Plaintiff relating to her neck, back, shoulder and hands were work-related. Dr. George S. Edwards of Raleigh Hand Center, P.A., stated that Plaintiff's job duties with Defendant-Employer did not cause or significantly contribute to the development of her bilateral carpal tunnel syndrome.
17. While working for Defendant-Employer from September 1995 to September 2003, Plaintiff held an administrative assistant position at the operations center and worked as a receptionist with some bookkeeping and accounting tasks. Keyboarding was a minor aspect of her job duties. Plaintiff did not engage in keyboarding or data entry repetitively, or for prolonged periods of time.
18. During a deposition given for her previous workers' compensation case, Plaintiff testified about her job duties as an administrative assistant saying, "I answer the phone. I use the computer a little bit. I do paperwork. It is not a hard job."
19. Kimberly Wood testified at deposition that she was currently employed at Defendant-Employer's operation center as an administrative assistant and had been employed with Defendant-Employer for a year and a half as Plaintiff's replacement. Ms. Wood was present in the courtroom when Defendants played a videotape in open court depicting the job duties of an administrative assistant with Defendant-Employer. Ms. Wood agreed that the videotape accurately depicted the speed and pace of the activities. As an administrative assistant, Ms. Wood answered the phones, greeted customers, took in reports, handled accounts payable and receivable, filed, used an adding machine, did some keyboarding, and was in charge of the meat store register. Answering the phone, reviewing, sorting and shuffling papers were the majority of her job activities.
20. Ms. Wood testified that her job duties as an administrative assistant were essentially the same as Plaintiff's and that her job as an administrative assistant was not stressful on her hands and wrists. She had not experienced any trouble with her hands or wrists while working as an administrative assistant.
21. The Full Commission accepts Ms. Wood's description of an administrative assistant's job duties with Defendant-Employer as credible.
22. Carla Lubbers testified at deposition that the owner of Defendant-Employer is her father. She has worked with Defendant-Employer for thirty or thirty-five years and she currently works in the operation center as a controller/executive administrator. As controller she oversees all accounts payable and receivable, financial statements, tax matters, inventory, and administrative office employees. Ms. Lubbers was Plaintiff's direct supervisor the entire time Plaintiff worked as an administrative assistant with Defendant-Employer.
23. Ms. Lubbers was present when Plaintiff testified as to her job duties. Ms. Lubbers testified that she had personally performed all of the job duties to which Plaintiff described, and those duties had not changed in any significant way since Ms. Lubbers served in that capacity. Further, Ms. Lubber testified that Ms. Wood essentially performs the same job duties as Plaintiff did.
24. The Full Commission accepts Ms. Lubbers's description of the administrative assistant's job duties with Defendant-Employer as credible.
25. Plaintiff has failed to prove that her current claim for medical treatment and indemnity compensation due to carpal tunnel syndrome, cervical strain and shoulder and arm pain are causally related to her employment duties as an administrative assistant for Defendant-Employer, or that her employment significantly contributed to the development of these conditions. The Full Commission gives little weight to Dr. Brown's October 13, 2004 written statement or opinion that Plaintiff's conditions were work related. Dr. Brown's statement is inconsistent with his September 12, 2003 statement on Plaintiff's long-term disability application that he did not know the cause of Plaintiff's carpal tunnel syndrome and his June 4, 2003 opinion that Plaintiff's current carpal tunnel syndrome did not arise out of her employment.
26. Dr. Brown never addressed whether Plaintiff's job duties as an administrative assistant with Defendant-Employer placed her at an increased risk of contracting carpal tunnel syndrome, or the cervical, arm and shoulder pain she reported, when compared to the general public, not so employed. No doctor has provided an expert medical opinion that Plaintiff's job duties as an administrative assistant placed her at an increased risk of contracting carpal tunnel syndrome, cervical, shoulder and arm problems when compared to the general public, not so employed. There is insufficient evidence of record from which to determine by its greater weight that subsequent to December 31, 1998, Plaintiff's employment with Defendant-Employer placed her at an increased risk of contracting carpal tunnel syndrome, neck, shoulder and arm problems or aggravating her carpal tunnel syndrome as compared to members of the general public, not so employed. There is no medical testimony on this issue.
27. Based on the greater weight of the evidence, Plaintiff has not suffered a compensable change of condition as defined by the Act. Plaintiff's claim for change of condition is premised on the compromise settlement agreement provision where she reserved the right to bring a claim for change of condition after December 31, 1998, for conditions relating to the original compensable injury. Plaintiff's current claim is for carpal tunnel syndrome as well as neck, arm and shoulder pain. Dr. Bullard did not know the origin of Plaintiff's cervical problems. Plaintiff's cervical, shoulder and arm problems were not the subject of the prior compromise settlement agreement, and therefore, would not constitute a change in condition unless, they are a direct and natural result of the original, admittedly compensable carpal tunnel syndrome. There is no expert, medical opinion testimony on this issue. Since Dr. Brown gave conflicting causation opinions, greater weight is given to the opinion of Dr. Edwards that Plaintiff's carpal tunnel syndrome is not related to her employment.
28. Plaintiff contends that she does not need to show that her employment caused her to contract carpal tunnel syndrome or placed her at an increased risk for contracting carpal tunnel syndrome in order to be eligible for medical compensation because she specifically reserved the right to bring a claim for future medical compensation arising from the prior injury. However, there is insufficient evidence from which to find that Plaintiff's current conditions are causally related to, or flowed directly from her prior compensable occupational disease based on the medical evidence. Consequently, Plaintiff has not proven a change of condition, nor has she met the statutory time period for change of condition. Defendants have proven that Plaintiff's current medical treatment was not related to her prior compensable carpal tunnel syndrome.
29. There is insufficient evidence of record from which to determine by its greater weight that Plaintiff has suffered a compensable injury by accident or specific traumatic incident arising out of and in the course of her employment with Defendant-Employer after December 31, 1998.
30. On September 3, 2003, Plaintiff was released by Dr. Brown to return to light-duty work. Plaintiff reported to work for Defendant-Employer. When she was told she could not claim a work-related injury and receive long-term disability, Plaintiff turned in her office keys and left the premises. Thereafter, Plaintiff applied for and received long-term disability benefits through the Defendant-Employer's disability plan and was considered to have resigned. Plaintiff's conduct constituted a constructive refusal of suitable employment.
31. Any disability Plaintiff may have suffered from May 29, 2003 to September 3, 2003, and thereafter was not related to a compensable injury or occupational disease.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. In order to prove that she contracted a compensable occupational disease, Plaintiff must show that her condition was caused by conditions, characteristic of and peculiar to her employment with Defendant-Employer and that her particular employment conditions placed her at a greater risk than the general public of contracting the disease. N.C. Gen. Stat. §97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983). Plaintiff has not proven by the greater weight of the evidence that her employment with Defendant-Employer subsequent to December 31, 1998, caused or significantly contributed to the development of the current carpal tunnel syndrome for which Dr. Brown performed surgery, or her cervical, arm and shoulder problems. N.C. Gen. Stat. § 97-53(13); Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979). Plaintiff has not proven by the greater weight of the evidence that subsequent to December 31, 1998, her employment duties with Defendant-Employer placed her at an increased risk of contracting or exacerbating her condition as compared to members of the general public, not so employed. N.C. Gen. Stat. § 97-53(13); Booker, supra.
Consequently, Plaintiff has not proven that her conditions are occupational diseases within the meaning of N.C. Gen. Stat. §97-53(13).
2. Pursuant to N.C. Gen. Stat. § 97-47, the Commission may review an award of compensation upon application of any party on the grounds of a change of condition. A "change of condition" has been defined as a condition occurring after a final award of compensation that is different from the conditions existing at the time the award was made. Weaver v. Swedish ImportsMaintenance, Inc., 319 N.C. 243, 354 S.E.2d 477 (1987). The change in condition can be a change in earning capacity, in physical condition or in degree of disability. Blair v. AmericanTelevision Communications Corp., 124 N.C. App. 420,477 S.E.2d 190 (1996). The burden of proving a change of condition is on the party seeking the modification. The moving party must prove the existence of the new condition and that it is causally related to the compensable injury. Willis v. Davis Indus.,13 N.C. App. 101, 185 S.E.2d 28 (1971).
3. Plaintiff has failed to present competent medical evidence that establishes a causal link between her current carpal tunnel syndrome and her original compensable carpal tunnel syndrome, which occurred beginning in 1993; or that her current carpal tunnel syndrome is a direct and natural consequence of her compensable carpal tunnel syndrome. Accordingly, Plaintiff is not entitled to compensation under the Act for a substantial change of condition. N.C. Gen. Stat. § 97-47.
4. A compromise settlement agreement terminating or purporting to terminate a controversy is a contract, to be interpreted and tested by established rules relating to contracts. Harris v. RayJohnson Construction Co., Inc., 139 N.C. App. 827,534 S.E.2d 653 (2000). The principal objective in the interpretation of a contract is to ascertain the intent of the parties. Holshouserv. Shaner Hotel Grp. Props. One, 134 N.C. App. 391, 397,518 S.E.2d 17, 23 (1999), aff'd per curiam, 351 N.C. 330,524 S.E.2d 568 (2000). The intent of the parties is ascertained "by construction of the `terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish.'"Lane v. Surety Co., 48 N.C. App. 634, 639, 269 S.E.2d 711,714-15 (1980).
5. When viewed in its entirety and in accordance with the above-stated principles of contract interpretation, the plain language of the terms of the compromise settlement agreement provides that the Plaintiff intended to reserve her right to file a claim for medical compensation and disability occurring after December 31, 1998, related to her original carpal tunnel syndrome and for a related change of condition. Further, a fair construction of the compromise settlement agreement indicates that Plaintiff's current claim would not be barred by the compromise settlement agreement. The medical evidence does not establish, however, that Plaintiff's current claim is related to her original compensable occupational disease. No expert medical testimony was presented and the medical evidence of record is insufficient to support a causal connection between her prior and current carpal tunnel syndrome.
6. Plaintiff did not present competent, expert medical opinion that her employment duties aggravated her carpal tunnel syndrome or exposed her to the hazards of carpal tunnel syndrome or neck, arm and shoulder problems. Anderson v. Gulistan Carpet, Inc.,144 N.C. App. 661, 550 S.E.2d 237 (2001).
7. Plaintiff has failed to prove that she suffered a compensable injury by accident or specific traumatic incident arising out of and in the course of her employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
8. Any disability Plaintiff may have suffered from May 29, 2003 through September 3, 2003, and thereafter was not causally related to a compensable occupational disease or injury by accident and is therefore not compensable. N.C. Gen. Stat. §97-2(9).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits must be, and hereby is, DENIED.
2. Each side shall bear its own costs.
This the __ day of June 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER